# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| A.M. et al.,<br><br>   Plaintiffs,<br><br>  v.<br><br>BRIDGES PUBLIC CHARTER SCHOOL,<br><br>  Defendant. | Civil Case No. 17-177 |

## MEMORANDUM OPINION

This is the second lawsuit Melissa and Matthew McCall have brought alleging Bridges Public Charter School teachers physically abused their disabled daughter A.M. The first, a claim under the Individuals with Disability Education Act, ended when this Court granted Bridges summary judgment. *See* Order, *A.M. v. Bridges Pub. Charter Sch.*, No. 17-2333 (D.D.C. Mar. 29, 2019), ECF No. 27.

Here, the McCalls bring seven other claims: Three for discrimination—under the Americans with Disabilities Act (ADA), the Rehabilitation Act, and the District of Columbia's Human Rights Act (DCHRA), respectively. And four more for torts—battery, intentional infliction of emotional distress (IIED), gross negligence, and gross negligent supervision.[1] *See* 2d Am. Compl., ECF No. 10.

Bridges again seeks summary judgment. But this time, it falls short. In arguing over the McCalls' discrimination claims, neither side followed the familiar footwork from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Yet the Court holds that case's burden-shifting

---

[1] The Court previously dismissed three other claims: a constitutional claim under 42 U.S.C. § 1983, a simple negligence claim, and a simple negligent supervision claim. *See* Order, ECF No. 35.

scheme keeps the McCalls' discrimination claims alive. And given the facts surrounding the McCalls' tort claims, the Court finds summary judgment premature there, too. So the Court will deny Bridges's motion.

## I. Background

A.M. suffers from severe developmental disabilities. Throughout her early childhood, D.C. Public Schools' early intervention programs administered support and services, eventually steering A.M. to Bridges Public Charter School, a school well-versed in special education.

But the McCalls were unsatisfied with Bridges. Specifically, Melissa was troubled by reports that A.M. was not napping, and by signs that A.M.'s bibs and diapers were not changed frequently enough. While visiting Bridges, Melissa also noticed teachers frequently using their cell phones and yelling at students for minor or involuntary transgressions. *See* Melissa McCall Dep. Tr. 80:7–81:3, ECF No. 42-2; *see also* ECF No. 44-3 at 21-22.

A new teacher named Donald Wallace shared similar concerns. Amid escalating interpersonal difficulties with his Bridges colleagues, Wallace reported teachers jokingly threatening nonverbal students with sayings like "I'm going to punch you in the face" (sometimes including an expletive), "lifting" students—including A.M.—"by their shoulders," and forcing a sobbing A.M. to lay on her cot during naptime by pinning her legs under a beanbag and "putting [their] feet up" on the beanbag for added resistance. ECF No. 44-3 at 26-29. But faced with mounting concerns about his job performance, and presented with a choice between teaching under a probationary arrangement or taking a $13,767 severance package, Wallace resigned after just two months. *See* ECF No. 44-3 at 30.

The rest of the record paints a more measured picture. To be sure, one Bridges teacher acknowledged that communication "barriers" made the classroom "[v]ery chaotic" and that

intrafaculty fighting contributed to a "toxic" environment. Shantelle Fuller Dep. Tr. 39:16–40:15, 49:7-18, ECF No. 44-4. And the use of the beanbag restraint was confirmed. *See* Kristen Williams Dep. Tr. 33:17–39:19, ECF No. 44-6. Yet Wallace himself walked back his accusations, testifying at his deposition that Bridges teachers "all seemed to be taking extraordinarily good custodial care in a way that would be perfectly, absolutely, one hundred percent acceptable in, say, a day care environment," if not a full-service "special education classroom." *See* Donald Wallace Dep. Tr. 103:3-16, ECF No. 44-9. For their part, the McCalls admit they never saw Bridges employees mistreat A.M. *See* Melissa McCall Dep. Tr. 81:8-15; Matthew McCall Dep. Tr. 54:5-13, ECF No. 42-3. And Bridges's internal investigation concluded Wallace's abuse allegations "were unfounded." Melissa McCall Dep. Tr. 114:20–115:5. What's more, a police investigation triggered by Wallace's report also led to no criminal charges, *see id.* at 153:1-8, but it did reveal that Wallace made similarly unfounded abuse allegations against other former colleagues at different schools. *See* Donald Wallace Dep. Tr. 59:7–60:5.

Even still, the McCalls filed this lawsuit. Their disability claims allege Bridges employees verbally and physically mistreated A.M. because she was nonverbal. Their battery claim concerns teachers restraining A.M. with the beanbag and their bodyweight. Their IIED claim argues the beanbag restraint was "extreme and outrageous beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." 2d Am. Comp. ¶ 69. Their gross negligence claim argues Bridges teachers gravely breached the standard of care owed by special-needs teachers. And their gross negligent supervision claim seeks to hold Bridges liable for allegedly failing to supervise A.M.'s teachers.

## II. Jurisdiction

Because the McCalls sue under two federal statutes—the ADA, 42 U.S.C. §§ 12101–12213, and the Rehabilitation Act, 29 U.S.C. §§ 701–797—this Court has jurisdiction under 28 U.S.C. § 1331. And because their tort claims "derive from a common nucleus of operative fact," this Court has supplemental jurisdiction under 28 U.S.C. § 1367. *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966). D.C. common law governs these claims. *See McGaughey v. District of Columbia*, 684 F.3d 1355, 1357 (D.C. Cir. 2012).

## III. Legal Standard

Rule 56(c) compels summary judgment if "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." In assessing whether genuine factual issues exist, the Court must "draw all reasonable inferences in favor of the nonmoving party" without "mak[ing] credibility determinations or weigh[ing] the evidence"—indeed, the Court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000). Thus a nonmovant can outlast summary judgment with evidence "allowing a reasonable jury [to] return a verdict" in its favor. *Chenari v. George Washington Univ.*, 847 F.3d 740, 744 (D.C. Cir. 2017); *see also First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968) ("[A]ll that is required [to defeat summary judgment] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.").

## IV. Discussion

The familiar adage "the best defense is a good offense" helped George Washington win the Revolution,[2] Jack Dempsey win the heavyweight title,[3] and the New England Patriots win six Super Bowls. But it does not help Bridges win this case at the summary judgment stage. Rather than argue for judgment as a matter of law, Bridges's motion assails the credibility of evidence accusing A.M.'s teachers of misconduct and exposing Bridges to vicarious liability. But Bridges's singular aim ignores its own vulnerabilities. For one, Bridges never answers the McCalls' prima facie discrimination claim. Nor does Bridges explain how the evidence supporting the McCalls' tort claims entitles Bridges to summary judgment. Simply put, blitzing the McCalls' main witness does nothing to intercept the McCalls' underlying claims.

### A. Bridges cannot obtain summary judgment on the discrimination claims because it fails to rebut the McCalls' prima facie case.

In the education context, the ADA,[4] Rehabilitation Act,[5] and DCHRA[6] guarantee disabled students the chance to receive the same educational benefits as nondisabled students.[7] A plaintiff suing under these statutes can articulate several theories: disparate treatment, disparate

---

[2] *See* Letter from George Washington to John Trumbull (June 25, 1799), https://founders.archives.gov/documents/Washington/06-04-02-0120 ("[O]ffensive operations, often times, is the *surest*, if not the *only* (in some cases) means of defence.").

[3] *See* 98 Hearst's Int'l Combined Cosmopolitan 104 (1935).

[4] "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

[5] "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

[6] "It is an unlawful discriminatory practice . . . for an educational institution [ t]o deny, restrict, or to abridge or condition the use of, or access to, any of its facilities, services, programs, or benefits of any program or activity to any person otherwise qualified, wholly or partially, for a discriminatory reason, based upon the actual or perceived . . . disability of any individual." D.C. Code § 2-1402.41.

[7] Because the ADA, Rehabilitation Act, and DCHRA are virtually "interchangeable," the Court analyzes these claims together. *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1260 n.2 (D.C. Cir. 2008) (internal quotation marks omitted) (quoting *Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999)); *see also Chang v. Inst. for Pub.-Private P'ships, Inc.*, 846 A.2d 318, 324 (D.C. 2004).

impact, failure to accommodate, retaliation, or creation of a hostile environment. *See Drasek v. Burwell*, 121 F. Supp. 3d 143, 153-54 (D.D.C. 2015) (collecting cases). Here, the McCalls allege disparate treatment, claiming A.M.'s teachers physically mishandled her, but not other students, since her disability rendered her nonverbal and unable to report the abuse. *See* Compl. ¶¶ 41, 48, 97. The McCalls also allege the teachers created a hostile learning environment by physically mistreating students and by verbally berating both colleagues and students. *Id.* Ultimately, because the McCalls can establish a prima facie case, and because Bridges lacks a meaningful response, the McCalls' claims survive summary judgment.

### 1. The McCalls establish a prima facie disparate treatment case but Bridges offers no nondiscriminatory justification.

To establish disparate treatment under the ADA, Rehabilitation Act, and DCHRA, the McCalls must show A.M.'s disability caused the alleged discrimination. *See supra* notes 1–3. In their papers, Bridges and the McCalls argue over whether expert opinion can sufficiently constitute direct evidence of causation.

But neither side acknowledges disparate treatment can also be proved circumstantially through the famous *McDonnell Douglas* framework. *See Duncan v. Wash. Metro. Area Transit Auth.*, 240 F.3d 1110, 1114 (D.C. Cir. 2001) (en banc). Initially, a disabled student need only establish a prima facie disparate treatment case: that she is disabled; that teachers excluded her participation in school activities or denied her educational benefits; and that teachers did not exclude or deny students without her disability.[8] Once she makes a prima facie showing, the burden shifts to the school to articulate a nondiscriminatory reason for the disparate treatment. And if the school does, the burden shifts back to the student to show the asserted justification

---

[8] The D.C. Circuit has never directly articulated the elements of a prima facie disparate treatment case in the special-education context. So the Court borrows this formulation from Judge Sutton's opinion in *Gohl v. Livonia Public Schools School District*, 836 F.3d 672, 682-83 (6th Cir. 2016).

was pretextual and the actual justification was discriminatory. *See Gohl*, 836 F.3d at 682-83. Yet at the summary judgment stage, that three-step collapses into one: "a plaintiff's prima facie case, combined with sufficient evidence to find that the [defendant]'s asserted justification is false, may permit [a reasonable] trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000).

The McCalls apparently do not realize they can easily clear this hurdle. After all, A.M.'s medical records clearly establish (and Bridges does not contest) that A.M's conditions meet the statutory definition of a disability: "a physical or mental impairment that substantially limits one or more major life activities of such individual; a record of such an impairment; or being regarded as having such an impairment." *See* 42 U.S.C. § 12102(1); *see also* ECF No. 44-3 at 2-18. To show teachers treated A.M. differently than other students, the McCalls can marshal evidence describing teachers using a beanbag and their bodyweight to force A.M.—but apparently not other students—to lie still on her cot. *See* ECF No. 44-3 at 28; Kristen Williams Dep. Tr. 37:4–40:20. And to show this alleged discrimination denied A.M. educational benefits, they can cite expert testimony that the treatment "negatively affected her ability to benefit from an education." ECF No. 44-8 at 7. Beyond besieging this evidence's credibility, Bridges does nothing to identify a nondiscriminatory explanation for the alleged discrimination.[9] But the Court cannot disbelieve this evidence at this stage. It can only—as it does here—conclude it could allow a reasonable factfinder to find Bridges teachers uniquely subjected A.M. to physical mishandling because of her disability.

---

[9] On its own, the Court can find only one potential nondiscriminatory explanation in the record: according to A.M.'s teachers, Melissa McCall consented to the beanbag restraint. *See, e.g.*, Kristin Williams Dep. Tr. 35:9-19. But enough other evidence suggests Melissa did not consent, *see, e.g.*, Melissa McCall Dep. Tr. 124:11–125:21, that summary judgment would still fail, even if Bridges advanced this explanation.

Since the McCalls can make out a prima facie disparate treatment case while Bridges fails to offer any nondiscriminatory justification, the McCalls' discrimination claims outwit summary judgment.

## 2. A reasonable factfinder could conclude A.M.'s teachers created a hostile learning environment.

Asserting a hostile learning environment claim involves a different process and different elements, but the same result. To establish a hostile environment, the McCalls must show A.M. faced "discriminatory intimidation, ridicule, and insult . . . sufficiently severe or pervasive to alter the conditions of the [classroom] and create an abusive [learning] environment." *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013) (internal quotation marks omitted) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).[10] To determine when a negative environment turns hostile, the Court "looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with [a student's] performance." *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008).

Here, the McCalls meet their burden to produce evidence suggesting Bridges teachers created a hostile learning environment. The record evinces teachers threatening students with things like "I'm going to punch you in the face" (sometimes adding an expletive), screaming at students for involuntary bodily functions, and ignoring disabled students' soiled bibs and diapers. *See* ECF No. 44-3 at 21, 27. Bridges responds only by challenging that evidence's credibility. But the Court cannot yet choose to disbelieve it. Since the record could enable a reasonable factfinder to conclude Bridges teachers created a hostile learning environment, Bridges's summary judgment motion fails.

---

[10] Again, although the D.C. Circuit has never addressed a teacher-created hostile learning environment in the special-education context, other courts have. *See, e.g., Lawton v. Success Acad. Charter Schs., Inc.*, 323 F. Supp. 3d 353, 367 (E.D.N.Y. 2018).

**B.  The summary judgment record does not entitle Bridges to judgment as a matter of law on the McCalls' tort claims.**

Bridges takes the same tack to defeat the McCalls' battery, IIED, gross negligence, and gross negligent supervision claims. But given its inability to dodge evidence supporting A.M.'s physical and verbal mistreatment, Bridges fails to justify judgment as a matter of law for any claim. Each will be discussed in turn.

First, battery. Under D.C. law, battery consists of "an intentional, unpermitted, harmful or offensive contact with [the plaintiff's] person or something attached to it." *Marshall v. District of Columbia*, 391 A.2d 1374, 1380 (D.C. 1978). Given the evidence at this stage—that Bridges teachers piled bean bags and their bodyweight on top of a sobbing A.M. to force her to stay still—what entitles Bridges to judgment as a matter of law on battery? After all, the Bridges teachers' beanbag restraint can certainly constitute an intentional and offensive contact with A.M.'s person. Bridges's contrary position is even more curious given its failure to meaningfully explain why this evidence would not enable a reasonable factfinder to conclude Bridges teachers battered A.M.[11]

So too for IIED. Under D.C. law, IIED consists of "extreme and outrageous conduct on the part of the defendant which intentionally or recklessly caused [the plaintiff] severe emotional distress." *Hill v. Medlantic Health Care Grp.*, 933 A.2d 314, 334 (D.C. 2007) (internal quotation marks and alterations omitted) (quoting *Howard Univ. v. Best*, 484 A.2d 958, 985 (D.C. 1984)). Though "[t]he requirement of outrageousness is not an easy one to meet," *see id.* (internal

---

[11] A passing citation to *Doe v. District of Columbia*, 796 F.3d 96, 107 (D.C. Cir. 2015) will not do, even if that case actually supports the proposition that D.C. law "provides a government actor with a privilege defense" when he "believe[s], in good faith, that [his] conduct was lawful," and "this belief was reasonable." *See* Bridges's Mot. Summ. J. 15, ECF No. 42. For one, the underlying D.C. cases do not establish this privilege applies to ordinary battery claims. *See Bradshaw v. District of Columbia*, 43 A.3d 318, 323-24 (D.C. 2012) (discussing a police officer's privilege against false arrest tort claims), *cited in Doe*, 796 F.3d at 107. And more importantly, it is far from undisputed that such a belief would be reasonable in this case.

quotation marks omitted) (quoting *Drejza v. Vaccaro*, 650 A.2d 1308, 1312 (D.C. 1994)), this Court previously held the beanbag restraint, "if true[,] would constitute outrageous behavior," as would the "physical[] and verbal[] abuse" A.M. and her classmates allegedly suffered "on a repeated basis as a result of their disabilities." Mem. Op. 6, ECF No. 34. And now—drawing all reasonable inferences in favor of the McCalls and disregarding all favorable evidence a factfinder would not be required to believe—the Court cannot yet disbelieve the evidence supporting the beanbag restraint and the alleged verbal and physical abuse. Accordingly, Bridges cannot obtain summary judgment on the McCalls' IIED claim.

Finally, gross negligence and gross negligent supervision. Under D.C. law, gross negligence "requires such an extreme deviation from the ordinary standard of care as to support a finding of wanton, willful and reckless disregard or conscious indifference for the rights and safety of others." *District of Columbia v. Walker*, 689 A.3d 40, 44 (D.C. 1997). Gross negligent supervision requires an employer to either have known, or to have been similarly careless in not knowing, that an "employee behaved in a dangerous or otherwise incompetent manner," and that "armed with that actual or constructive knowledge," the employer "failed to adequately supervise the employee." *Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 760 (D.C. 2001) (internal quotation marks omitted) (quoting *Giles v. Shell Oil Corp.*, 487 A.2d 610, 613 (D.C. 1985)). Bridges concedes the beanbag restraint "could potentially support causes of actions for gross negligence and gross negligent supervision against Bridges," but argues "[t]here is, however, no evidence to support this allegation." Bridges's Mot. Summ. J. 14. On the contrary. *See, e.g.*, ECF No. 44-3 at 28; Kristen Williams Dep. Tr. 37:4–40:20. And—for the fourth time—despite any credibility problems, the Court cannot decide to disbelieve this evidence at the summary judgment stage. Because the current record does not support judgment as a matter of

law, the Court cannot grant Bridges summary judgment on the McCalls' gross negligence or gross negligent supervision claims.

## V. Conclusion

Because Bridges's summary judgment motion begins by attacking the credibility of the McCalls' evidence, it ends with the Court's denial. Since the McCalls establish a prima facie case of disability discrimination, and since Bridges does not assert a nondiscriminatory explanation, Bridges cannot obtain summary judgment on their discrimination claims. And Bridges's motion further fails since Bridges cannot justify judgment as a matter of law on the McCalls' tort claims. A separate order follows.

May  /  , 2019

Royce C. Lamberth
United States District Judge